**IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **UTAH ENVIRONMENTAL CONGRESS,**<br><br>    **Plaintiff,**<br><br><br><br>        **vs.**<br><br><br><br>**JACK TROYER,**<br>**in his official capacity as Regional Forester**<br>**of the Intermountain Region of the U.S.**<br>**Forest Service; DALE BOSWORTH, as**<br>**Chief of the Forest Service; and the**<br>**UNITED STATES FOREST SERVICE,**<br><br>    **Defendants.** | **MEMORANDUM OPINION AND**<br>**DECISION**<br><br><br><br>**Case No. 1:04CV00155 PGC** |

This matter is before the court on Plaintiff Utah Environmental Congress's ("UEC's") *Olenhouse*[1] Motion seeking reversal of the United States Forest Service's approval of six separate projects, including: (1) the East Fork Fire Salvage Sale, (2) the Bear Hodges II Timber Sale, (3) the South Manti Timber Salvage Project, (4) the East Mountain State of Utah Institutional Trust Lands Administration ("Trust Lands") Road Access Project, (5) the White River Salvage Sale, (6) and the Dark Valley Vegetation Management Project.

---

[1] *Olenhouse v. Commodity Credit Corp*, 42 F.3d 1560, 1580 (10th Cir. 1994).

The governing law in this case is the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and its implementing regulation at 36 C.F.R. § 219.35, which requires the Forest Service to consider the "best available science" in implementing site-specific projects within a forest unit in accordance with the Forest Plan of the particular National Forest.[2]  In this case, these requirements create only two issues: (1) Whether the Forest Service complied with the applicable Forest Plan's quantitative Management Indicator Species ("MIS") obligations, and (2) whether the Forest Service appropriately concluded that the approved project would not affect species viability within the forest.  The court concludes that the Forest Service adhered to 36 C.F.R. § 219.35 by complying with the quantitative MIS obligations required by the applicable Forest Plans and by reasonably concluding that the approved projects would not affect species viability within the forest.  Accordingly, the court concludes that UEC's *Olenhouse* Motion for reversal of the approval of the aforementioned Forest Service projects is DENIED.

## BACKGROUND

In 2004, the United States Forest Service, acting through the Wasatch-Cache, Manti-La Sal, Uinta, and Dixie National Forests, approved six forest projects within the State of Utah. These projects included the East Fork Fire Salvage Sale and the Bear Hodges II Timber Sale in the Wasatch-Cache National Forest, the South Manti Timber Salvage Project and the East Mountain Trust Lands Road Access Project in the Manti-La Sal National Forest, the White River Salvage Sale in the Uinta National Forest, and the Dark Valley Vegetation Management Project

---

[2] 36 C.F.R. § 219.35(a) (2000).

in the Dixie National Forest.

Within the Wasatch-Cache National Forest, the Forest Service has planned the East Fork Fire Salvage Sale and the Bear Hodges II Timber Sale.  The Forest Service proposed the East Fork Fire Salvage Sale in response to the East Fork Fire, which burned over 14,000 acres of the Wasatch-Cache National Forest in July, 2002.[3]  This project involves salvaging dead trees, drainage maintenance, improvement of roads, building 4.4 miles of temporary roads, decommissioning several roads, and reforesting 100 acres.[4]  The Bear Hodges II Timber Sale was designed to provide research and demonstration opportunities within the T.W. Daniels Experimental Forest for faculty and students at Utah State University.[5]  The project involves harvest on approximately 700 acres to help perpetuate the spruce component of the forest by reducing its susceptibility to beetle infestation and to evaluate the effectiveness of different spruce regeneration treatments.[6]

Within the Manti-La Sal National Forest, the Forest Service planned the South Manti Timber Salvage Project and the East Mountain Trust Lands Road Access Project.  It is undisputed that the South Manti Timber Salvage Project consists of a salvage harvest of dying spruce trees from the project area.[7]  The spruce in the project area have been severely affected by

---

[3]*See* Administrative Record ("AR"), Vol. 39 at EF02679.

[4]*See* AR, Vol. 39 at EF02680.

[5]*See* AR, Vol. 33 at BH03147.

[6]*See* AR, Vol. 33 at BH03147–67.

[7]*See* AR, Vol. 18 at SM11395–96.

a spruce beetle epidemic, which killed approximately 90 percent of the spruce trees over 11

inches in diameter.  In addition, the project includes the reconstruction of 9.2 miles of roads, the

construction of a half mile of temporary road, the decommissioning of 8.8 miles of unclassified

roads and trails, and the planting of approximately 350 acres of Engelmann spruce.  The East

Mountain Trust Lands Road Access Project consists of constructing roads to access three

inholdings owned by the Trust Lands.  The roads will allow the Trust Lands and their lessees to

remove timber from the tracts and to construct an exploratory well.  The roads will also provide

access to a federal oil and gas lease.  The decision authorizes the reconstruction or construction

of 7.33 miles of road, 1.38 miles of which the Trust Lands owns.

    The Forest Service planned the White River Salvage Sale in the Uinta National Forest to

reduce damage caused by the Douglas-fir beetle and dwarf mistletoe and to promote a greater

natural variety of vegetation in the area by removing some conifer cover to allow growth of

Aspen.[8]

    The Forest Service planned the Dark Valley Vegetation project within the Dixie National

Forest to address continuing spruce beetle damage and to explore vegetation management

methods with minimal disturbance to the forest.  The purpose of the project is to reduce

vegetation densities in order to protect the area from insect infestations and to produce a diversity

of species by reducing competition within forest stands.[9]

    At issue in this case is whether the UEC met its burden of affirmatively demonstrating

---

[8]*See* AR, Vol. 25 at WR05289.

[9]*See* AR, Vol. 5 at DV03947.

that the Forest Service failed to comply with 36 C.F.R. § 219.35 at the time it approved these challenged projects.  To meet this burden, UEC must demonstrate that the Forest Service failed to adequately monitor MIS as required by the particular National Forest's Land and Resource Management Plan ("LRMP") and that the Forest Service arbitrarily and capriciously concluded that the approved projects would not affect species viability within the forest.

## **STANDARD OF REVIEW**

UEC brings this petition for reversal under the arbitrary and capricious standard of review pursuant to Federal Rule of Appellate Procedure 15 and *Olenhouse v. Commodity Credit Corp.*[10] The court must affirm the Wasatch-Cache, Manti-La Sal, Uinta, and Dixie National Forest Services' approval of their respective projects unless the specific decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[11]  This is a narrow and deferential standard, and the "court is not empowered to substitute its judgment for that of the agency."[12]  As the Tenth Circuit Court of Appeals explained, the federal courts "are limited to determining whether the agency substantially complied with statutory and regulatory procedures, whether substantial evidence supports its factual determinations, and whether its action is an abuse of discretion."[13]  A court may disregard an agency's legislative interpretation only when it is contrary to plain and unambiguous statutory language, or if it is an impermissible

---

[10]42 F.3d 1560, 1580 (10th Cir. 1994).

[11]*Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1521 (10th Cir. 1992).

[12]*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 401, 413–16 (1971).

[13]*Burke v. Board of Governors*, 940 F.2d 1360, 1365 (10th Cir. 1991), *cert. denied*, 504 U.S. 916 (1992) (citations omitted).

interpretation of ambiguous statutory language.[14]  Furthermore, an "agency's interpretation of its own regulations, including its procedural rules, is entitled to great deference."[15]  The decisions of an agency are entitled to a presumption of regularity and, therefore, the party challenging the decision has the burden of showing the decision was unreasonable.[16]  After review of the record, the court concludes that the Forest Service examined relevant data and articulated a satisfactory explanation for its action, including articulating a rational connection between the facts found and the choices that the Forest Service made.[17]

## APPLICABLE LAW

Before exploring the merits of the case, an understanding of the applicable law is vital. Governing law includes the NEPA, the NFMA, and NFMA's implementing regulations.

### A.  NEPA

Each forest project is subject to the NEPA.  Though UEC does not dispute that the Forest Service complied with its NEPA's requirements, an overview of these requirements is helpful in understanding the language describing the challenged projects.  Under NEPA, the Council on Environmental Quality promulgated regulations that provide three categories of agency action and the required agency review for each category.  First, actions that may significantly affect the

---

[14]*Chevron U.S.A., Inc., v. National Resources Defense Council*, 467 U.S. 837, 843–845 (1984); *Quivira Min. Co. v. Nuclear Regulatory Comm'n*, 866 F.2d 1246, 1249 (10th Cir. 1989).

[15]*Bar MK Rances v. Yuetter*, 994 F.2d 735, 738 (10th Cir. 1993).

[16]*Citizens to Preserve Overton Park*, 401 U.S. at 415; *Park County Resource Council, Inc. v. United States Dept. of Agriculture*, 817 F.2d 609, 621 (10th Cir. 1987).

[17]*See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

environment require an Environmental Impact Statement ("EIS").  After reviewing the EIS, the

Forest Service records its approval of the project in its Record of Decision ("ROD").  Second,

actions that may or may not have a significant environmental impact require a more limited

Environmental Assessment ("EA") to determine whether an EIS is necessary.  If the project does

not significantly impact the environment, the Forest Service issues a Finding of No Significant

Impact ("FONSI") and no EIS is required.  Third, certain actions qualify as categorical

exclusions from the requirements of preparing an EA or an EIS because they do not have a

significant effect on the environment.  For projects that qualify, the Forest Service issues a

decision memo to note its approval.[18]

The Wasatch-Cache National Forest completed an EIS and issued a ROD for the East

Fork Fire Salvage Sale on June 14, 2004, and for the Bear Hodges II Timber sale on May 14,

2004.[19]  The Manti-La Sal National Forest also completed an EIS and issued a ROD for the

South Manti Timber Salvage Project on June 16, 2004, and for the East Mountain Trust Lands

Road Access Project on July 12, 2004.[20]  The Uinta National Forest completed an EA and issued

a Decision Notice and FONSI for the White River Salvage Sale on March 4, 2004.[21]  The Dixie

National Forest issued a Decision Memo on October 7, 2004 for the Dark Valley Vegetation

---

[18]*See* 40 C.F.R. §§ 1500.4(p), 1501.4(a)(1), 1501.4(a)(2), 1501.4(c), 1508.4.

[19]*See* AR, Vol. 42 at EF05668, Vol. 36 at BH05276.

[20]*See* AR, Vol. 18 at SM11410.

[21]*See* AR, Vol. 28 at WR07909.

management project because it qualified as a categorical exclusion.[22]

### B.   NFMA and Implementing Regulations

Forest Plans and projects are promulgated and implemented under the NFMA and its

implementing regulations. The NFMA imposes substantive duties on the Forest Service such as

the duty to "provide for diversity of plant and animal communities."[23]  The NFMA's

implementing regulations delineate specifically how the National Forests will satisfy those

substantive duties.  The court must first determine which set of  implementing regulations to

apply in this case.  For many years, courts have reviewed forest projects under the 1982 Forest

Planning regulations at 36 C.F.R. § 219.  On November 9, 2000, however, the Department of

Agriculture replaced the 1982 regulations with new regulations.[24]

In the wake of this action, courts have adopted varying approaches to reviewing Forest

Service decisions made after November 9, 2000.  For example, the Ninth Circuit and several

district courts have simply reviewed the decisions under the old 1982 regulations without

explaining why the 2000 regulations were inapplicable.[25]  In contrast, other courts have applied

the 2000 regulations and stated that the 1982 regulations were no longer in effect.  For example,

the District Court for the Southern District of Illinois stated, "On November 9, 2000, the

---

[22]*See* AR, Vol. 5 at DV04283.

[23] *Utah Environmental Congress v. Zieroth*, 190 F.Supp.2d 1265, 1268 (D. Utah 2002).

[24]70 Fed. Reg. 1023 (Jan. 2005); 65 Fed. Reg. 67568–581 (Nov. 9, 2000).

[25]*Lands Council v. Powell*, 379 F.3d 738 (9th Cir. 2004); *Colo. Wild v. USFS.*, 200 F. Supp. 2d 1184 (D. Colo. 2004); *Sierra Club v. Eubanks*, 335 F. Supp. 2d 1070 (E.D. Ca. 2004); *Sierra Club v. Bosworth*, 352 F. Supp. 2d 909 (D. Minn. 2005).

Department of Agriculture made wholesale changes to the relevant regulations, making prior citations obsolete."[26]  Likewise, the District Court for the Western District of Virginia and the District Court for the District of Vermont held that the 1982 regulations did not apply to decisions that the Forest Service made after the 2000 regulations took effect.[27]  In response to this confusion on which set of regulations courts should apply when reviewing Forest Service decisions, the Department of Agriculture issued a non-binding interpretive rule to clarify that the 1982 regulations were no longer in effect and that a specific provision of the 2000 regulations, 36 C.F.R. § 219.35, was the only applicable law after January 9, 2000.[28]

In 2004, in *Utah Environmental Congress v. Bosworth*, the Tenth Circuit suggested its agreement that the 2000 regulations govern recent acts by the Forest Service.[29]  In *Bosworth*, the Circuit applied the 1982 regulations only because the Forest Service approved the challenged project before January 9, 2000, and, therefore, the 1982 regulations were the regulations "in effect at the time of the disputed Forest Service decisions."  The circuit also noted, however, that, in 2000, the Department of Agriculture passed new regulations, and Judge Baldock, in his concurring opinion, directly explained that "the Forest Service's adoption of new planning regulations effectively moots" the use of the 1982 regulations in future cases. [30]  In this district,

---

[26]*Shawnee Trail Conservancy v. Nicholas*, Case No. 02-CV-4065-JPG (S.D. Ill. 2004).

[27]*Clinch Coalition v. Damon*, 316 F. Supp. 2d 364, 381 (W.D. Va. 2004); *Forest Watch v. United States Forest Service*, 322 F. Supp. 2d 522, 528 (D. Vt. 2004).

[28]36 C.F.R. § 219.35, Appendix B.

[29]*Utah Envtl. Cong. v. Bosworth*, 372 F.3d 1219, 1221 (10th Cir. 2004).

[30]*Id.* at 1221, 1233.

Judge Kimball has followed the lead of the Tenth Circuit by applying the 2000 regulations to a

decision that the Forest Service made after those regulations came into effect.  Judge Kimball

clarified that "during the transition period of November 2000 to January 2005, only the transition

provisions of section 219.35 of the 2000 regulations applied and neither the remainder of the

2000 planning regulations nor any of the 1982 regulations were binding on site-specific

decisions."[31]  In accord with the Tenth Circuit and Judge Kimball, this court will apply the 2000

regulations in this case because the Forest Service approved the disputed forest projects in this

case after the 2000 regulations came into effect.  One of the provisions of the 2000 regulations,

36 C.F.R. § 219.35, requires the Forest Service to consider the "best available science" in

implementing site-specific projects within a forest unit in accordance with the Forest Plan of the

particular National Forest.[32]  In this case, these requirements create two issues: (1) whether the

Forest Service complied with its quantitative MIS obligations as required by the applicable

Forest Plan, and (2) whether the Forest Service appropriately concluded that the approved project

would not affect species viability within the forest.

In the near future, courts will review forest projects under a new set of implementing

regulations that the Department of Agriculture put into effect on January 5, 2005.[33]  Thus, if the

Forest Service issues a project decision after January 5, 2005, that project must comply with the

---

[31] *Utah Envtl. Cong. v. Bosworth*, Case No. 2:04-CV-643 (D. Utah 2005).

[32] 36 C.F.R. § 219.35(a).

[33] 36 C.F.R. § 219.14 (2005).

2005 regulations.[34]  The Forest Service has argued for using the 2005 regulations in this case. However, because this case is before the court on arbitrary and capricious review under the Administrative Procedure Act, the only issue before the court is whether the Forest Service acted arbitrarily and capriciously in implementing the law in effect at the time.  Consequently, the court must assess whether the Forest Service followed the 2000 regulations because this was the law in effect at the time the Forest Service approved the disputed forest service decisions.

## INDIVIDUAL FOREST PROJECTS

The Forest Service complied with its requirement to consider the best available science in a manner consistent with the requirements of the applicable Forest Plan when it approved each forest project.  Specifically, the Forest Service complied with its quantitative MIS obligations as required by the applicable Forest Plan, and the Forest Service appropriately concluded that each approved project would not affect species viability within the forest.  The disputed projects include the East Fork Fire Salvage Sale and the Bear Hodges II Timber Sale in the Wasatch-Cache National Forest, the East Mountain Trust Lands Road Access Project and the South Manti Timber Salvage Project in the Manti-La Sal National Forest, the White River Salvage Sale in the Uinta National Forest, and the Dark Valley Vegetation Management Project in the Dixie National Forest.  The court will address the challenges to each of these projects in turn.

### Wasatch-Cache National Forest

UEC asserts that the Wasatch-Cache National Forest lacks adequate monitoring data for three MIS: (1) the snowshoe hare; (2) beaver; (3) and the Bonneville Cutthroat Trout ("BCT").

---

[34]*Id.*

However, the Forest Service complied with its quantitative MIS obligations as required by the Wasatch-Cache National Forest Land and Resource Management Plan ("LRMP") and reasonably concluded that the East Fork Fire Salvage Sale and the Bear Hodges II Timber Sale would not affect species viability within the forest.

### 1. Snowshoe Hare

The Forest Service complied with its quantitative MIS obligations with regard to the snowshoe hare.  The Wasatch-Cache LRMP requires the Forest Service to monitor snowshoe hare along transects, establish a baseline, and evaluate the data to determine a population trend every five years.[35]  The Forest Service monitored data along transects between 2000 and 2002 and established a baseline.[36]  The Forest Service also collected annual monitoring data at the established transects between 1998 and 2003 and reported the population trend results from the baseline and monitoring data.[37]  Consequently, the Forest Service complied with its quantitative MIS obligations with regard to the snowshoe hare as required by the Wasatch-Cache National Forest LRMP.

The Forest Service reasonably concluded that the East Fork Fire Salvage Sale would not affect species viability within the forest because it found that none of the proposed harvest units contain any snowshoe hare habitat, as all usable habitat was destroyed by the East Fork Fire.[38]

---

[35]Wasatch-Cache National Forest Plan, Case File at BH00041, at 4-113.

[36]*See* AR, Vol. 30 at BH02121–47.

[37]*See* AR, Vol. 30 at BH00028–29.

[38]*See* AR, Vol. 39 at EF02844.

The Forest Service also noted that the habitat will regrow to a foraging size useful to snowshoe hares within 15–20 years and that the project will not affect the regrowth.[39]

The Forest Service also reasonably concluded that the Bear Hodges II Timber Sale would not affect species viability within the forest because the project treatments were designed to maintain the spruce-fir habitat used by the snowshoe hare.[40]  Moreover, localized loss of habitat would not significantly impact the species forest-wide.  The Forest Plan identifies approximately 500,000 acres of snowshoe hare habitat forest-wide, and the project will only affect approximately 700 total acres of forest land.[41]

### 2.  Beaver

The Forest Service complied with its quantitative MIS obligations with regard to beaver. The 2003 Wasatch-Cache LRMP states that the Forest Service must monitor one to two 4th order Hydrologic Unit Codes ("HUC") (a drainage unit) each year after it establishes a baseline and must analyze data for population trends after five years.[42]  The Forest Service collected the required HUC monitoring data for beaver after establishing a baseline.[43]  In addition, the Forest Service analyzed the 2000 Utah Furbearer Harvest Report and a 2003 beaver survey which

---

[39]*See* AR, Vol. 39 at EF02923.

[40]*See* AR, Vol. 33 at BH03258.

[41]*Id.*

[42]Wasatch-Cache National Forest Plan, Case File at BH00041, at  4–113 to 4–114.

[43]*See* AR, Vol. 39 at EF02845.

provided quantitative data of the beaver population.[44] The Forest Service supplemented the required data with aerial photograph analysis of beaver activity in 1969, 1981, 1992, and 2002.[45] Since the Forest Plan requirements concerning beaver were only promulgated two years ago, the population trend data is not yet due.

The Forest Service reasonably concluded that the East Fork Fire Salvage Sale would not affect beaver viability within the forest.  UEC does not seriously contest this fact, and the Forest Service determined that there would be no substantial impact on beaver or beaver habitat because the timber harvest will not include riparian areas.[46]  The Forest Service also determined that the Bear Hodges II Timber Sale would have no impact on beaver since there is currently no known beaver habitat within the project area.

### 3.  Bonneville Cutthroat Trout

The Forest Service complied with its quantitative MIS obligations with regard to the BCT.  The Wasatch-Cache Forest Plan requires the Forest Service to monitor BCT through the fish condition index by collecting various data from at least one 4th order HUC per year and evaluating that data for population trends at five-year intervals.[47]  The Forest Service has complied with that requirement by providing fish data from 1990–2003 and trout monitoring data

---

[44]*See* AR, Vol. 39 at EF02845.

[45]*Id.*

[46]*See* AR, Vol. 39 at EF02923.

[47]Wasatch-Cache National Forest Plan, Case File at BH00041, at 4-114.

from 1994 to 2003.[48]  Though UEC contests that the only BCT data that the Forest Service collected was taken far from the Bear Hodges II Timber Sale, this argument is without merit for two reasons.  First, there is no requirement in the Forest Plan that the Forest Service must gather project-specific BCT data.  Second, the Forest Service gathered data from many sampling locations in the Logan River drainage, which includes the Bear Hodges II Timber Sale project area.[49]

The Forest Service reasonably concluded that neither project would affect BCT viability within the forest.  The Forest Service used monitoring data to determine that BCT population trends in the East Fork Fire Salvage analysis area were either stable or that they would persist after the completion of the proposed project.[50]  The Forest Service also determined that the Bear Hodges II Timber Sale would have no impact on the BCT since there is currently no known BCT habitat within the project area.

### Manti-La Sal National Forest

UEC contends that the Manti-La Sal Forest Service did not adequately monitor macroinvertebrate populations within the forest.  However, the Forest Service complied with its quantitative MIS obligations as required by the Manti-La Sal National Forest LRMP and reasonably concluded that the Trust Lands Road Access Project and the South Manti Timber Salvage Project would not affect species viability within the forest.

---

[48]*See* AR, Vol. 37 at EF00269–01131, Vol. 30 at BH00822.

[49]*See, e.g.,* AR, Vol. 37 at EF00903–946, Vol. 37 at EF00539, Vol. 33 at BH03133.

[50]*See* AR, Vol. 39 at EF02845.

The Manti-La Sal LRMP recommends that the Forest Service measure and report macroinvertebrate data every five years using the Biotic Condition Index ("BCI") and the Habitat Condition Index ("HCI").[51]  However, the Forest Plan also provides flexibility for the Forest Service to determine the best monitoring technique.[52]  The Forest Service focused on using the BCI to monitor macroinvertebrates to "show trends and determine whether Plan standards are met because [the] BCI best represents stream health and water quality at [a] sample point."[53]

The Manti-La Sal National Forest complied with the Forest Plan's quantitative MIS obligations.  Though the Forest Plan requires monitoring every five years, the Forest Service compiled a series of detailed Aquatic Macroinvertebrate Inventories annually from 1990 to 1995 and from 1997 to 2000.[54]  The Forest Service compiled and evaluated these annual inventories into broader monitoring reports.[55]  At least 190 records from approximately 31 streams have been collected and analyzed, and "[a]ll divisions of the forest are represented by at least one stream."[56]  In discharge of the agency's Forest Plan obligations, the monitoring reports evaluate water quality, the diversity of aquatic life, and discuss overall stream condition trends.[57]

---

[51]See Manti-La Sal Forest Plan, AR, Vol. 6 at SM00158, at IV-6

[52]Id. at IV-2.

[53]See AR, Vol. 6 at SM00188.

[54]See AR, Vol. 12 at SM06097-SM06143, SM06050–96, SM06023–49, SM05993–06022, SM05909–92, SM05846–908, SM05783–845, SM05644–719.

[55]Id. at SM05435–37, SM00188–91.

[56]See AR, Vol. 12 at SM05378c.

[57]Id. at SM05378a-f.

The Forest Service appropriately concluded that the projects would not affect species viability within the forest.  The Record of Decision for the East Mountain Trust Lands Road Access Project concludes that the project will not affect drainages with macroinvertebrate habitat or any other macroinvertebrate habitat.[58]  Likewise, the South Manti Timber Salvage Project would not affect macroinvertebrate habitat because (1) macroinvertebrate indices would not be expected to fall below Forest Management Plan standards, (2) removal of dead and dying trees would not, in itself, affect land stability, (3) changes to sediment load will not be measurable, and (4) "road reconstruction, maintenance, and decommissioning in the Selected Alternative will improve soil conditions and will reduce erosion concerns."[59]

### Uinta National Forest: The White River Salvage Sale

UEC challenged the White River Salvage Sale by asserting that the Forest Service lacked appropriate data for the Colorado River Cutthroat Trout ("CRCT").  However, the Forest Service complied with its quantitative MIS obligations as required by the Uinta National Forest LRMP and reasonably concluded that the White River Salvage Sale would not affect species viability within the forest.  The Uinta National Forest's LRMP requires the Forest Service to consider thirty-three percent of sample streams annually to determine CRCT population estimates and to measure habitat conditions every five years.[60]

The Forest Service met both of these requirements.  The Forest Service annually surveyed

---

[58]*See* Record of Decision, AR, Vol. 6 at SM00158, at 13.

[59]*See* AR, Vol. 18 at SM11400, Vol. 17 at SM10084; *See also* AR, Vol. 16 at SM09103–14.

[60]*See* Uinta National Forest Plan, Case File at WR00142, at 6-6.

the required percentage of sample streams for CRCT population trend data between 1991 and 2002.[61]  In 2003, the Uinta National Forest exceeded Forest Plan requirements and collected population estimates from 53 percent of streams with CRCT populations.[62]  The Forest Service also monitored habitat conditions every five years.[63]

The Forest Service appropriately concluded that the project would not affect species viability within the forest.  It analyzed the forest-wide CRCT population trend data between 1991 and 2002 and noted no observable change in CRCT populations.[64]  Based on this population trend data and an evaluation of the project's impacts, the Forest Service concluded that "it is not anticipated that timber harvesting will increase risks beyond those currently present under existing environmental conditions."[65]

UEC also claims that Forest Service must specifically monitor the CRCT in the Left Fork White River area.  The court rejects this argument, however, because the Forest Plan only requires forest-wide monitoring.  Nevertheless, the Forest Service does possess CRCT population data specific to the Left Fork White River.  The Forest Service conducted Fishery surveys between 1995 and 1998 to show that the estimated population density in the Left Fork

---

[61]*See* AR, Vol. 21 at WR01388.

[62]*See* AR, Vol. 21 at WR01458.

[63]*See* AR, Vol. 22 at WR01836.

[64]*See* AR, Vol. 21 at WR01388.

[65]See AR, Vol. 25 at WR05441.

White River area was typical compared to other cutthroat populations in the forest.[66]  The Forest

Service also provided population data for the Left Fork in a 1996 Fish Population and Habitat

Quality Index survey, a 1998 Left Fork White River habitat survey and electro-fishing data, a

1998 report on the cutthroat trout population, a 1998 and a 2000 Left Fork White River

Monitoring Report, and a 2002 Left Fork White River Survey.[67]

### Dixie National Forest: The Dark Valley Vegetation Management Project

UEC next argues that the Forest Service did not adequately monitor Colorado River

Cutthroat Trout ("CRCT") or, in the absence of a fish population in the project area,

macroinvertebrates.  The Dixie National Forest Plan requires the Forest Service to monitor

cutthroat trout by various methods, including gill netting and creel census.[68]  UEC claims that the

Forest Service has not sufficiently performed this monitoring, while the Forest Service points to

various forest reports to contest that it has fulfilled the Forest Plan's requirements.[69]  The court

need not make a decision on this particular issue because UEC has failed to meet its burden of

demonstrating that the Forest Service arbitrarily and capriciously concluded that the Dark Valley

Vegetation Management Project would not affect CRCT or any other trout viability within the

forest.  In addition, the Forest Plan does not require the Forest Service to monitor

---

[66]*See* AR, Vol. 21 at WR01345.

[67]*See* AR, Vol. 21 at WR00894, WR00973–980, WR01041, WR01269, Vol. 22 at WR02047.

[68]*See* Dixie National Forest Plan, AR, Vol. 1 at DV00002, at V-5.

[69]*See* AR, Vol. 1 at DV00009, DV00810, DV00826, DV00182, Vol. 2 at DV01730, Vol.3 at DV01730, DV01774.

macroinvertebrates for this project.

### 1.  CRCT

With regard to the CRCT, UEC failed to meet its burden of demonstrating that the Forest Service arbitrarily and capriciously concluded that the Dark Valley Vegetation Management Project would not affect CRCT viability within the forest.  As previously mentioned, the Tenth Circuit established that decisions of an agency are entitled to a presumption of regularity and, therefore, the party challenging the decision has the burden of showing that the decision was unreasonable.[70]  Moreover, this court has previously explained that, when challenging a forest project, a plaintiff's burden includes "affirmatively showing that the Project may significantly adversely affect any of the species for which UEC could properly show monitoring has not occurred."[71]  UEC has not demonstrated that the Dark Valley Vegetation Management Project will significantly adversely affect the CRCT or any other type of MIS trout, and therefore, did not meet its burden.

In fact, the Dixie National Forest reasonably concluded that there is no CRCT habitat in the Dark Valley project area.  The CRCT is not native to the Dixie National Forest and was only introduced in1999 to an isolated basin in the Escalante Ranger District.[72]  The Forest Service proposed the Dark Valley Vegetation Management Project in a different Ranger District.  With regard to other MIS trout, the record reflects that the Dixie National Forest has collected and

---

[70]*Park County Resource Council, Inc. v. United States Dept. of Agriculture*, 817 F.2d 609, 621 (10th Cir. 1987).

[71]*Utah Envtl. Cong. v. Bosworth*, Case No. 2:04-CV-643 (D. Utah 2005).

[72]*See* AR, Vol. 3 at DV01736.

reported the required monitoring data and has analyzed that data to determine forest-wide habitat capability, occupancy, as well as population trend.[73]  Utilizing this data, the Forest Service appropriately determined that the Dark Valley Vegetation Management Project would not affect trout viability within the forest.

### 2.  Macroinvertebrates

UEC argues that macroinvertebrates are a Dixie National Forest MIS and that the Forest Service has failed to collect sufficient macroinvertebrate data.  However, the Dixie National Forest LRMP does not specifically require the Forest Service to monitor aquatic macroinvertebrates.[74]  UEC bases its allegation that the Forest Service is obligated to collect macroinvertebrate data within the Dark Valley project area on a misapprehension of the Forest Plan.  The Forest Plan discusses macroinvertebrates as an alternate aquatic habitat indicator for assessing "fish habitat capability" where fish population data is not available for a particular body of water.[75]  The record does not indicate that any body of water in the Dark Valley project provides fish habitat, and thus, there was no obligation to consider any fish habitat indicator, including macroinvertebrates, before approving the Dark Valley Vegetation Management Project.

Consequently, the Forest Service complied with its quantitative MIS obligations as required by the Dixie National Forest LRMP and reasonably concluded that the Dark Valley Vegetation Management Project would not affect species viability within the forest.

---

[73]*See* AR, Vol. 1 at DV00810, DV00826, DV00009, DV00698.

[74]*See* Dixie National Forest Plan, AR, Vol. 1 at DV00002, at V-5 to V-6.

[75]*Id.* at II-17.

**<u>CONCLUSION</u>**

For the reasons stated, the court DENIES UEC's motion to review and reverse the United States Forest Service's approval of the East Fork Fire Salvage Sale, the Bear Hodges II Timber Sale, the South Manti Timber Salvage Project, the East Mountain Trust Lands Road Access Project, the White River Salvage Sale, and the Dark Valley Vegetation Management Project. Accordingly, the Clerk of Court is directed to close this case.

DATED this 5th day of July, 2005.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge